UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x

ROSA GARCIA

Plaintiff,

vs.

THE ARKER COMPANIES, LLC, AC RINCON
TAPER INC, CHATEAU GC LLC, AND
ERNESTO CAMAS AND ADAN RINCON IN
THEIR INDIVIDUAL CAPACITIES,

Defendants.

-------------------------------------------------------------- x

Civil Action No:  21 Cv. 3243

**FEDERAL COURT COMPLAINT**

**JURY DEMAND**

Plaintiff Rosa Garcia ("Garcia") by and through her attorneys, The Gender Equality Law Center,

upon personal knowledge, and upon information and belief alleges as follows:

## NATURE OF THE ACTION

1.      Plaintiff brings this action against The Arker Companies LLC ("Arker Companies"), AC

Rincon Taper, Inc ("AC Rincon") and Chateau GC, LLC ("Chateau GC") and individually against Ernesto

Camas ("Camas") and Adan Rincon ("Rincon") (collectively, "Defendants") to remedy claims of gender

discrimination, specifically for sexual harassment and retaliation in violation of Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and the New York City Human Rights Law, Title 8 of

the Administrative Code of New York City §107 *et seq.* ("NYCHRL").

## INTRODUCTION

2.      This is a case of blatant and horrendous sexual harassment that Plaintiff Garcia was forced to

endure throughout her three months of employment with Defendants working as a laborer performing taping

and finishing work inside a construction site in a building located at 911 Erskine Street, Brooklyn, New

York. ("911 Erskine," "the Building" or "the Site").

3.      For the three months of her employment, before Garcia was terminated in retaliation for

objecting to this mistreatment, Garcia was forced to endure unrelenting sexual harassment.  This included

Camas repeatedly asking her out on dates and insisting that she engage in a sexual relationship with him, his making constant comments that objectified her based on her body and gender, physically touching Garcia without her consent, including one assault when both were alone in an apartment at the Site, stalking Garcia outside of work, sending her unwanted text messages and calling her late at night, demanding that she not socialize with other male workers on the job, as well as other abusive conduct.

4.      The abuse and harassment only increased the more Garcia pushed back and protested this conduct.  In addition to Camas assigning Garcia more work and tasks beyond her job description, he began to criticize her work without objective basis and to yell and scream at her using a multitude of ugly offensive language and epithets.

5.      There were no polices or procedures for Garcia to use at Defendants' place of work to remedy this harassment. In fact, because Camas was her supervisor and had the apparent authority to terminate her employment or recommend that Rincon do so, Garcia was left to fend for herself in an increasingly stressful and emotionally demeaning work environment.

6.      Finally, after complaining one last time, Camas recommended to Rincon that Garcia be fired in September of 2019, notwithstanding that there was still internal construction work to be done in many of the apartments at 911 Erskine.

7.      As a result of this termination, Garcia was left without an income to support herself and her family.

8.      While employed with Defendants Garcia suffered daily humiliation, sadness, shame, fear and emotional exhaustion as well as anxiety and depression. This emotional distress was compounded by Plaintiff's inability to find comparable work after being illegally fired by Defendants and her concern and worry about supporting her family.

9.      Garcia still suffers to this day from severe emotional distress as relates to the discrimination and mistreatment she experienced while employed with Defendants.

**JURISDICTION AND VENUE**

10.     This Court has original federal question jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331.

11.     This Court also has supplemental jurisdiction over Garcia's City law claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in the Eastern District of New York pursuant to 29 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

13.     On January 23, 2020, Plaintiff filed a timely Charge of Discrimination ("Charge") asserting claims against all three Defendants with the United States Equal Employment Opportunity Commission ("EEOC").

14.     More than 180 days have elapsed since the EEOC assumed jurisdiction over the Charge.

15.     On March 11, 2021, Plaintiff received right to sue notices from the EEOC for all three Respondents.  A copy of each EEOC Right to Sue Notice is attached to this Complaint as Exhibit 1.

**THE PARTIES**

A.  **Plaintiff**

16.     Plaintiff Garcia is a 32-year-old Latina woman who currently resides in the Bronx, New York. Garcia is primarily a Spanish speaker with limited English proficiency.

17.     Garcia was employed by Defendants from approximately July of 2019 until September of 2019 as a taper or finisher working on drywalling.

B. **Defendants**

18.     Defendant AC Rincon is a construction company with its principal office located at 2885 Dewitt Place, Bronx, New York 10469.  Upon information and belief, this company is owned by Adan Rincon.

19.     AC Rincon provides drywall, taping and finishing work for construction projects, including newly built and/or renovated apartment buildings.

20.     Upon information and belief, AC Rincon was hired by the Arker Companies to provide general contracting services to renovate and/or rehabilitate the building located at 911 Erskine.

21.     Defendant Chateau GC is a domestic limited liability corporation whose corporate headquarters are located at 1044 Northern Boulevard, 2nd Floor, Roslyn, New York 11576.

22.     Upon information and belief, Chateau GC is owned by the Arker Companies or one of the principals of the Arker Companies.

23.     Upon information and belief, Chateau GC was hired and/or brought onto the Site to provide security and other safety protocols for laborers employed to work at 911 Erskine.

24.     The Arker Companies is a real estate development company and domestic limited liability corporation located at 1044 Northern Boulevard, 2nd Floor, Roslyn, New York 11576.

25.     Upon information and belief, the Arker Companies owns and/or owned the building located at 911 Erskine at the time Plaintiff was employed as a laborer in the Building.

26.     At the relevant time period to the facts alleged in this lawsuit, the Arker Companies were in charge of developing and/or rehabilitating the building located at 911 Erskine.

27.     Upon information and belief, the Arker Companies received significant tax subsidies and other financial benefits from the City of New York as well as other government entities in exchange for renovating and/or rehabilitating the 911 Erskine building and as part of that work allocating a certain number of units of low income housing.

28.     The Arker Companies was at all times relevant to the facts alleged in this complaint

responsible for ensuring that Chateau GC, and AC Rincon were fully in compliance with all New York City

and New York State workplace laws.

29.     At all times relevant to this complaint, Garcia's supervisors while employed at the Erskine

location were Rincon and Camas.

## FACTS

### A.  Garcia's Job at AC Rincon Inc

30.     Garcia was employed by AC Rincon from approximately July of 2019 until September of

2019 as a taper/finisher of drywall.

31.     Upon information and belief, AC Rincon was hired by the Arker Companies to provide

drywall, taping and finishing work at 911 Erskine.

32.     At the beginning of Garcia's employment, Garcia was given a work badge which stated the

name of a general contractor company called Chateau GC, LLC. The badge also had the name AC Rincon

written on it.

33.     Upon information and belief, Chateau GC was in charge of all safety and security protocols

for the workers working at 911 Erskine.

34.     While employed with AC Rincon, Garcia was assigned to work at 911 Erskine.

35.     Because Garcia is primarily a Spanish speaker with limited English proficiency, she

communicated with Rincon and Camas in Spanish.

36.     Camas was responsible for assigning and supervising Garcia's daily work, as well as the work

of all the laborers who worked performing drywalling and taping.

37.     Rincon would come to the worksite to pay the workers approximately once or twice a week.

He also had the authority to hire and fire workers at the site. Camas reported directly to Rincon and was

known as Rincon's "right hand."

38.     On several occasions, Camas told Garcia that Rincon trusted his judgment.  He also said that if he told Rincon that one of his employees was not doing a good job that Rincon would change that person's job duties or position.  Based on these statements Garcia believed Camas had the power and authority to impact the terms and conditions of her job, including firing her.

39.     During Garcia's first week of employment, Camas trained Garcia, and she shadowed his work. During this period of time, Garcia learned that she was one out of three women working on the Site.

40.     By about the second or third week of her employment, Garcia performed the tasks of her job on her own, but worked in close proximity to Camas, who was also doing drywalling work while supervising her job duties. While Garcia occasionally worked with other coworkers, the vast majority of time Garcia worked alone with Camas on the same floor or in the same apartment.

**B.   Camas Made Sexual Comments To Garcia on And
Off The Job And Stalked Her Outside of Work**

41.     Beginning almost immediately after Garcia began working on the Site, Camas began to regularly refer to her as "mi amor" (my love), "chiquita" (which in effect in English means "baby girl" or "little girl" and is used as a term of endearment for a woman who is small or petite), "mi reina" (my queen), and "bebe" (baby).

42.     Camas would also say to Garcia, "estas para comerte," which is slang in Spanish for "you are fuckable" and/or "you are eatable." Camas would also tell Garcia that "all the guys desire you." Garcia tried to ignore these comments, which made her feel demeaned and humiliated whenever she heard them.  When Camas would say to Garcia: "You are fuckable" she felt particularly humiliated and threatened.  Despite her push back on these comments Camas' did not stop.

43.     Camas also frequently asked Garcia to go out with him on dates. Garcia's response was always "para. Tengo novio," which translates in English as "stop. I have a boyfriend." In addition, Camas asked her several times in Spanish to give him a kiss.  Garcia verbally protested against these statements and emphatically told Camas that she did not want to give him a kiss.

44.     Camas also took photos of Garcia on his cell phone without her knowing. Garcia only discovered this weeks later when he sent her pictures of herself eating lunch, which made her feel exposed and angry.

45.     Camas' comments and advances did not end when Garcia left work on any given day. After work, Camas would regularly call Garcia on her cell phone, attempt to initiate video-calls, and would send Garcia text messages at late hours of the night or early in the morning when she was off from work.  Some of these texts contained sexually explicit and offensive comments, messages, photos, songs and videos. These text messages or calls included, but were not limited to, the following:

(a) Referring regularly to Garcia in text messages as my "love," "baby," "my baby" and "tiny  girl."

(b)  Repeatedly sending her messages with the words "my  love" or "hello beautiful." Camas would also transmit to Garcia's phone pictures or video messages of hearts, flowers or intimate sayings.

(c)  Persistently pursuing Garcia to ask for dates, for instance asking, "so, my love, we go out tomorrow?" When Plaintiff did not respond, Camas would insist on asking her "what's wrong, I am calling you, my love?"

(d).  Sending photos of bottles of alcohol late at night suggesting that Camas wanted to have drinks with Garcia.

46.     On one occasion, Camas called Garcia after work hours and in an angry tone of voice demanded to know if she was together with a male coworker name Nicolas (last name unknown) because Camas believed (inaccurately) that she was romantically and/or sexually involved with Nicolas.

47.     Garcia was not interested in Nicolas, but she did seek out his support and complained to him about the harassment.

## C.  Camas Begins to Touch Garcia in a Sexual And Provocative Manner Without Her Consent And Then Assaults Her

48.     In addition to Camas's humiliating and offensive comments to Garcia while on and off the worksite, he began physically touching her at work without her consent and in a manner which was clearly

inappropriate and sexual.   This touching started with his grabbing her hand or touching her side or back or ribs when both of them were alone at work.

49.     In addition, Camas pursued Garcia and touched her without her consent outside of work. For instance, on one occasion, Camas followed Garcia to the subway station she was walking to in order to travel home and then followed her into the station and onto the same subway car.  After he entered the subway car, he grabbed Garcia's hand, which she quickly pulled away.  Camas appeared surprised and somewhat indignant over her rejection of him and began stating over and over again in Spanish, "it's not a big deal." Garcia told Camas: "Yes, it is! In this country if you touch a woman, it is illegal, and I could even call the police." Camas's reaction was to smirk and laugh at her.

50.     Garcia's threat to call the police did not dissuade Camas from further touching her.  In fact, just a few days later he assaulted her while both were working in an apartment alone.

51.     At one point during the workday, Camas approached Garcia from behind, while she was bending down working and thrust his pelvis and genitals up against her buttocks.  While doing this, he laid his body on top of hers.  This was a terrifying moment for Garcia, who is small and petite and who felt overwhelmed by this assault.  At that moment she did not know what Camas would be capable of doing. Notwithstanding her anxiety, Garcia was able to push Camas off of her while yelling at him in Spanish: "What is the matter with you!?"

52.     In response, Camas appeared angry and called Garcia "crazy."  He then stormed off. Garcia felt violated, powerless and terrified, especially because Camas and she had been alone.

53.     After this incident, Garcia became terrified of working Camas alone in one of the apartments. However, she could not afford to leave her job because she desperately needed to earn a living to help support herself and her family.

54.     Following this assault, where Camas attempted to simulate a sexual act with Garcia, Camas began touching Garcia's body during nearly every shift that they worked together. This included Camas walking from behind Garcia and touching her sides, waist and ribs as well as her belly and buttocks.

55.     Garcia became hypervigilant at great emotional cost to her sense of well-being because she never knew when Camas would approach her from behind and unexpectedly and without her consent touch her. When he did, Garcia always pushed his hands off of her and said, in Spanish, words to the effect of, "Stop! Why are you doing that," or "l don't like when you do that." He would often laugh at her reaction.

56.     This constant potential of being re-assaulted when Plaintiff and Camas were alone, which was a great deal of the time, filled Garcia with anxiety and fear on almost a daily basis.  Such fear and anxiety created an intolerable work environment for Garcia.

57.     The one reliable time during the day that Garcia could buffer herself from Camas' relentless sexualized attention, advances and touching, was during her lunch period.  Garcia began eating lunch at the same time as her other co-workers so that she could avoid Camas.  But other than this brief respite, she was exposed hours each day to the potential of being sexually harassed or even assaulted by Camas in almost total privacy.

### D.  The More Garcia Made Clear that She Would Not Tolerate Camas' Sexual Advances, the Angrier And More Jealous He Became

58.     Garcia's efforts to push back against Camas's conduct and protect herself while at work only caused him to become angry.

59.     Camas spoke and acted as if he was jealous that he did not have Garcia's undivided attention. For instance, he lashed out at Garcia after she ate lunch with coworkers saying (in Spanish): "Why do you hang with the other male coworkers, but not with me," or words to that effect.  He also expressed jealousy over Garcia's work relationship with Nicolas (last name unknown) to whom Garcia confided about the harassment and abuse on the job.

9

60.     On August 23, 2019, Camas sent Garcia a text message saying, "Now that you found another macho go eat wherever you want."  Garcia believes Camas was referring Nicolas.

61.     To make a point about his belief that he controlled Garcia and that she was not to interact with other male workers on the job,  Camas sent Garcia a video in mid-August 2019 that appeared to show their male coworker Nicolas being "humped" by another male co-worker; a video which was extremely offensive to Garcia.  Garcia believes that Camas was attempting to suggest that Nicolas was gay and therefore someone whom Garcia would not be interested.

62.     In or about August of 2019, Camas grew more critical of Garcia's work, and he began losing his temper more and more with her.

63.     Camas continued to pursue Garcia even while he vented his anger on her. In each of these situations he demanded to know why Garcia was avoiding him.  For instance, Camas would yell at Garcia when she avoided him at work or on the subway where he often followed her.

64.     Camas' language toward Garcia became more and more offensive and aggressive.  Some examples of the words he used when yelling at her include words in Spanish like "cock" (verga), "fucking woman" (pinche vieja), and "asshole" (culera). He also used words such as "bitch" and "faggot" in text messages he sent to Garcia. All of this language was experienced by Garcia as degrading and abusive.

65.     On any given day, Garcia never knew whether Camas' would be pursuing her, making sexualized comments or touching her.  Or, alternatively whether he would be yelling abusively at her in retaliation for pushing him away.

        Camas' hostile conduct caused Garcia to feel increasingly stressed, demeaned, and humiliated both while at work and at home. Garcia suffered from headaches and felt emotionally exhausted and depressed. Garcia often experienced trouble getting out of bed. She felt shame and anxiety whenever she would encounter Camas at work as well as fear and dread at the thought of being alone with him in a specific apartment or area of the Building.

**E. Respondents Retaliated Against Garcia Because She Resisted
Camas's Sexual Advances and Objected to the Hostile Work
Environment She Was Forced To endure on The Job**

66.     As a result of Garcia pushing back against Camas' abusive and hostile treatment of her on the job, Camas began assigning Garcia more and more work, some of it outside of her normal duties and responsibilities and some of it more difficult than she was experienced to handle.  In turn, he began criticizing her work without basis.

67.      Camas' also began losing his temper more and more and he increased the number of times he would scream obscenities and epithets at Garcia.

68.     On September 10th or 11th 2019, Rincon was at the worksite and told Garcia to help Camas with the work he was doing in one of the apartments. Garcia called Camas on the phone to ask where he was and he screamed, "Qué verga dices?!" which in English in effect means, "What the cock are you saying!?" Once again, Garcia asked him not to speak to her using that language and she went back to work.

69.     The following day, Garcia asked Camas in which apartment she should work, and he yelled: "Go work somewhere else! Go work with someone else!" In response to Camas's yelling, Garcia told Camas that she would go and work with someone else. Camas then became angry and threatened Garcia's job, saying in Spanish: "You can leave now, and twenty people will be here tomorrow for your job."

70.     Following this outburst, Garcia left the apartment that she and Camas were working in. As she left the area, she overheard Camas laugh and tell a coworker that he "was just fighting with his wife... a couple's fight." Garcia could not believe that any co-worker would believe the abusive manner in which Camas was yelling at Garcia was as a normal as a husband and wife disagreement and that there appeared to be no awareness on the Site that sexual harassment or gender based abuse was against the law.

**F. Garcia is Fired in Retaliation For Opposing
Camas' Unlawful Sexual Harassment and Abuse**

71.     On September 12, 2019, while Garcia was working on drywalling in a specific apartment, Camas came into the same apartment to work, and began yelling at Garcia for being too slow and taking too

11

long. Garcia did not understand why Camas was yelling at her, as she had been working at a normal pace, even though she was assigned more apartments than her co-workers and more difficult tasks that were not part of her position and had not been assigned before.

72.     Camas then told Garcia that Rincon was angry with her, and Camas threatened to tell Rincon that Garcia was not following instructions. The implication of this threat was that Garcia's job was on the line, but not for any work-related task that she had failed to finish. Garcia asked Camas if she could speak with Rincon directly to clear up any misunderstandings about her following instructions, and Camas became furious at this request.

73.     Later that day, Camas mockingly said to Garcia: "Give Adan a hug from me," which made Garcia feel that Rincon would never believe what Garcia had to say about Camas's behavior because they were such good friends.

74.     The next day, on September 13, 2019, Rincon was at the worksite to give Garcia and other employees their paychecks. Garcia spoke with Rincon and explained that Camas was yelling at her and criticizing her about her work performance without cause. Rincon did not ask Garcia any questions about what had happened in the apartment between her and Camas or about Camas's conduct towards her. Rincon's response was to laugh at Garcia.  He then said in Spanish "Ok, I will talk with Ernesto." Immediately afterwards, Garcia saw that Rincon and Camas were speaking.

75.     Only hours later, Garcia received a phone call from Rincon. Rincon told Garcia to take a few days off to rest and that he would contact her the following week if there was work. Rincon also said to take her belongings and to look for a new job. At the time of this lay-off, many of the apartments located at 911 Erskine still needed internal construction work completed, including taping and finishing tasks, the work that Garcia had been hired to do.

76.     About a week afterwards, Garcia sent Rincon a text message asking if he needed her to come back to work, and Rincon repeated that Garcia should find a new job.

### G. Defendants Failed To Provide Any Sexual Harassment Prevention Policies or Training at The Site in Violation of Both New York State And New York City Human Rights Law

77.     Effective 2018, all New York employers are required to provide anti-sexual harassment policies to their employees and to train their employees on an annual basis about sexual harassment prevention.  These amendments are found in the New York State Human Rights Law and the Stop Sexual Harassment NYC Law, Local Law 92, 2018 ("NYC Stop Sexual Harassment Law").  The purpose of enacting these laws was to respond to heightened awareness in New York State stemming from the #MeToo movement and the problems faced by employees in being supported and encouraged to come forward and complain to their employer about such illegal conduct and to ensure that employees are not retaliated against in doing so. *See*  https://www.ny.gov/combating-sexual-harassment-workplace/employers; https://www1.nyc.gov/site/cchr/law/stop-sexual-harassment-act.page

78.     Under the NYC Stop Sexual Harassment Law, all employers must ensure that mandatory sexual harassment prevention policies distributed to employees include the following provisions:

➢   An explanation of sexual harassment as a form of unlawful discrimination under local law;

➢   A statement that sexual harassment is also a form of unlawful discrimination under state and federal law;

➢   A description of what sexual harassment is, using examples;

➢   Identification of any internal complaint process available to employees through their employer to address sexual harassment claims;

➢   A description of the complaint processes available through the Commission, the New York State Division of Human Rights and the United States Equal Employment Opportunity Commission, including contact information;

➢   A statement that retaliation for complaining about sexual harassment is against the law and specific examples of what retaliation looks;

➢   Information concerning bystander intervention, including but not limited to any resources that explain how to engage in bystander intervention; and

➢   A statement or identification of a policy provision specifying the responsibilities of supervisory and managerial employees in the prevention of sexual harassment and retaliation, and measures that such employees may take to appropriately address sexual harassment complaints.

*Id.*

79.     At no time during Garcia's employment with Defendants did she receive any sexual

harassment prevention policies or training on this subject from Defendants as mandated by New York State

and New York City.  As a result, Garcia had no knowledge about her rights to be free of sexual harassment,

intimidation, assault and abuse on the job, including to be free of any retaliation for rejecting the advances of

Camas, his touching and stalking of her and for complaining about the hostile work environment in which she

was forced to work.

80.     Camas had the authority to recommend which employees of AC Rincon would be hired or

fired and recommended that Garcia be terminated from Defendants' employment.

81.     Rincon relied on Camas' input to decide to fire Garcia, without ever asking her about what

was happening on the job.

82.     Rincon who is the owner of AC Rincon fired Garcia after she tried to complain about the

sexual harassment and abuse she was experiencing in the workplace.

83.     The Arker Companies hired AC Rincon to perform internal construction work within the

building located at 911 Erskine. Upon information and belief, at no time did the Arker Companies ensure that

their contractor AC Rincon was providing a safe and harassment free workplace for its workers as mandated

by New York State and New York City law.

84.     Upon information and belief, Chateau GC was retained to ensure the security and safety of the

Building as well as the laborers working at 911 Erskine.  At no time did Chateau GC provide any policies or

trainings to ensure the safety and security of female laborers working in the apartments at 911 Erskine.

85.     Upon information and belief, the Arker Companies received substantial tax subsidies and

other private and/or public funding (direct or indirect) because 911 Erskine was designated as a multi-income

housing unit that included providing some number of units for low income residents in New York City.

86.     Upon information and belief, in order to receive many of these tax subsidies and other private and/or government related funding, the New York City Council had to vote on and approve proposals and/or requests for such funding made by the Arker Companies.

87.     Upon information and belief, other government agencies and/or private entities may have been required to approve the tax subsidies and/or receipt of private and/or government funding received by the Arker Companies in support of their developing and/or rehabilitating 911 Erskine.

88.     The Arker Companies failed to ensure that all of the contractors it hired and/or retained and brought into work in the building located at 911 Erskine were in compliance with the New York State and New York City laws that ensure that female laborers can work on construction sites without being sexually harassed or abused.

## FIRST CAUSE OF ACTION
### Discrimination in Violation of Title VII

89.     Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

90.     Defendants unlawfully discriminated against Plaintiff in the terms and conditions of her employment, including creating and permitting to exist an abusive and hostile work environment on the basis of Garcia's sex.

91.     Defendants' discriminatory acts caused Garcia to suffer severe emotional distress, including but not limited to humiliation, fear, emotional exhaustion, shame, anxiety and depression.

92.     Defendants acted willfully, with malice and/or reckless indifference to Plaintiff's rights, therefore entitling Plaintiff to an award of punitive damages.

93.     Defendants are liable to Plaintiff for emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, and costs.

## SECOND CAUSE OF ACTION
### Retaliation in Violation of Title VII

94.     Garcia realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

95.     By the foregoing acts and omissions, Defendants retaliated against Plaintiff because she pushed back on Camas' sexual advances, non-consensual touching, stalking and in response to at least one serious assault, as well as other sexualized and abusive conduct directed toward her.  This retaliation included increasing Garcia's workload, giving her work beyond the scope of her job, criticizing her work performance without objective basis, Camas increasing the abuse towards Garcia, including screaming at Garcia using degrading epithets and ultimately terminating Garcia her from her employment in violation of Title VII.

96.     Defendants' discriminatory acts caused Garcia to lose wages and benefits, as well as to experience severe emotional distress both while still on the job and after being fired.

97.     Defendants acted willfully, with malice and/or reckless indifference to Plaintiff's rights, therefore Plaintiff is entitled to an award of punitive damages.

98.     Defendants are liable to Plaintiff for damages related to lost wages and benefits, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, and costs.

## THIRD CAUSE OF ACTION
### Discrimination in Violation of the NYCHRL

99.     Garcia realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

100.     Defendants improperly discriminated against Plaintiff in the terms and conditions of her employment on the basis of her gender by subjecting her to the unfettered sexual advances, sexualized comments, touching and stalking, including at least one assault from Camas, as well as his creation of a hostile work environment in which Plaintiff was forced to work in violation of the NYCHRL.

101.   Under § 8-107(1) of the City Human Rights Law, both Rincon and Camas are directly and personally liable for the discriminatory actions taken against Garcia.

102.   Defendants' discriminatory acts caused Garcia to experience severe emotional distress, including but not limited to humiliation, fear, emotional exhaustion, shame anxiety and depression.

103.   Defendants unlawful and retaliatory actions constitute malicious, willful, and wanton violation of the City Human Rights Law for which Garcia is entitled to an award of punitive damages.

104.   Therefore, Defendants are liable to Plaintiff for damages related to emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, and costs.

## FOURTH CAUSE OF ACTION
### Retaliation in Violation of the NYCHRL

105.   Garcia realleges and incorporates by reference all preceding paragraphs as if they were set forth again herein.

106.   By the foregoing acts and omissions, including but not limited to Plaintiff's termination, Defendants retaliated against Plaintiff because she pushed back on Camas' sexual advances, non-consensual touching, including at least one assault and stalking as well as other abusive conduct directed toward her. Defendants also retaliated against Garcia by increasing her workload, assigning her work beyond the scope of her job duties, criticizing her work performance without basis and by Camas' abusive yelling and screaming directed at Plaintiff in which he used humiliating and degrading epithets in violation of the NYCHRL.

107.   Defendants' discriminatory acts caused Garcia to lose wages and benefits, as well as to experience severe emotional distress both while she was still employed by Defendants and after she was fired.

108.   Under § 8-107(1) of the City Human Rights Law, both Rincon and Camas are directly and personally liable for his acts of retaliation against Garcia.

109.   Defendants unlawful and retaliatory actions constitute malicious, willful, and wanton violation of the City Human Rights Law for which Garcia is entitled to an award of punitive damages.

17

110.   Defendants are liable to Plaintiff for lost wages, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, and costs.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment:

a)  Declaring that the discriminatory actions, practices, and policies of Defendants as set forth above violated Title VII and the NYCHRL;

b)  Declaring that the retaliatory actions, practices, and policies of Defendants set forth above violated Title VII, and the NYCHRL;

c)  Awarding monetary damages to Plaintiff to compensate her for the discrimination she has experienced, including lost wages and benefits and for the emotional distress she endured;

d)  Awarding Plaintiff punitive damages pursuant to Title VII and the NYCHRL;

e)  Awarding Plaintiff reasonable attorneys' fees;

f)  Awarding Plaintiff pre and post judgment on any award;

g)  Granting any other related relief that the Court deems appropriate.

Dated: Brooklyn, New York
       June 7, 2021

Respectfully submitted,

**GENDER EQUALITY LAW CENTER**

By: _____
Allegra L Fishel
540 President Street, 3rd Floor
Brooklyn, New York 11215
Telephone: (347) 844-9003; Ext. 1
Attorney for Plaintiff