UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
ROSA GARCIA,

                Plaintiff,                  **MEMORANDUM AND ORDER**
                                                  21-CV-3243 (RPK) (CLP)

     v.

THE ARKER COMPANIES, LLC; AC
RINCON TAPER INC; CHATEAU GC LLC;
ERNESTO CASAS; and ADAM RINCON,

                Defendants.
-----------------------------------------------------------x

RACHEL P. KOVNER, United States District Judge:

        Plaintiff Rosa Garcia alleges that she endured severe sexual harassment at the hands of her supervisor while working on a construction site for three months in 2019. She brought this action, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*, against four defendants. Two—The Arker Companies, LLC and Chateau GC, LLC—now move for summary judgment. They argue that neither entity constitutes plaintiff's "employer" within the meaning of Title VII and the NYCHRL. For the reasons set forth below, defendants are entitled to summary judgment on this basis, and their motion is granted.

## BACKGROUND

        The following facts are taken from the parties' Rule 56.1 statements and relevant portions of the record and are undisputed unless otherwise noted.

        Defendant The Arker Companies, LLC is an umbrella name for a group of entities involved in the real-estate business. Defs.' Rule 56.1 Statement ("Defs.' 56.1 Statement") ¶ 1 (Dkt. #59-1). Defendant Chateau GC, LLC, one of the entities within The Arker Companies, served as the general contractor at a job site located at 911 Erskine, Brooklyn, New York, where a different

1

Arker-affiliated entity was constructing an affordable housing apartment building. *Id.* ¶ 2; Pl.'s Rule 56.1 Counterstatement ("Pl.'s 56.1 Statement") ¶¶ 11, 13–14 (Dkt. #60-2). Chateau hired Rockaway Contracting Corp. as a subcontractor to perform sheetrocking, carpentry, and drywalling at the 911 Erskine construction site. Defs.' 56.1 Statement ¶ 12; Pl.'s 56.1 Statement ¶ 22. Rockaway in turn hired defendants Adam Rincon and his company AC Rincon Taper Inc. to perform taping work. Defs.' 56.1 Statement ¶¶ 13–14.

Plaintiff Rosa Garcia works as a day laborer at construction projects around the city. Pl.'s 56.1 Statement ¶ 3. She heard about available work at the 911 Erskine jobsite through a friend. Pl.'s 56.1 Statement ¶ 50; Defs.' 56.1 Statement ¶¶ 28–29. That friend brought Garcia to the jobsite, where AC Rincon's foreman directed her to report to defendant Ernesto Casas. Pl.'s 56.1 Statement ¶¶ 50–53; Defs.' 56.1 Statement ¶¶ 29–31. That same day, she began taping walls under Casas's supervision. Pl.'s 56.1 Statement ¶ 53; Defs.' 56.1 Statement ¶ 31. Her rate of pay was determined in a conversation with Adam Rincon, and she received her pay in the form of cash within an unmarked envelope directly from Rincon at the end of each week. Pl.'s 56.1 Statement ¶¶ 55, 63.

During Garcia's time on the jobsite, Casas allegedly sexually propositioned, harassed, and stalked her. Defs.' 56.1 Statement ¶ 75; Garcia Decl. ¶¶ 51–54 (Dkt. #60-4). Garcia also alleges that, after she rejected his sexual advances, Casas became more critical of her taping work. Garcia Decl. ¶ 55. After a few months on the job, Rincon informed Garcia that the jobsite no longer required as many tapers and that she was being laid off. Defs.' 56.1 Statement ¶ 70; Pl.'s 56.1 Statement ¶ 79.

Plaintiff filed this lawsuit in June 2021. Compl. (Dkt. #1). She alleges that the defendants violated Title VII and the NYCHRL by creating a hostile work environment on the basis of her

2

sex and by retaliating against her for her rejection of Casas's sexual advances. *Id.* ¶¶ 90–110. As relief, plaintiff seeks lost wages, compensatory damages, punitive damages, prejudgment and post-judgment interest, as well as attorney's fees and costs. *Id.* ¶ 110. The Arker Companies and Chateau now move for summary judgment, principally arguing that neither was her employer for purposes of employment-discrimination liability.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) (citation and quotation marks omitted). "A fact is material if it might affect the outcome of the suit under governing law." *Ibid.* (citation and quotation marks omitted). In determining whether there is a genuine issue of material fact, a court evaluates the whole record, resolving all ambiguities and drawing all reasonable factual inferences in favor of the non-movant. *See ibid.* A nonmoving party can survive summary judgment only if there is sufficient evidence to permit a rational trier of fact to find in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

## DISCUSSION

Because plaintiff has not set forth evidence from which a reasonable jury could find that either The Arker Companies or Chateau was plaintiff's "employer," both defendants are entitled to summary judgment on the plaintiff's claims.

"[T]he common law of agency governs the meaning of 'employer' and 'employee' in Title VII," *Felder v. U.S. Tennis Ass'n*, 27 F.4th 834, 843 (2d Cir. 2022), and the NYCHRL, *see Farmer*

3

*Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 321 (S.D.N.Y. 2020).  When considering whether an employer-employee relationship is established, courts consider a set of nonexhaustive factors, including:

> The hiring party's right to control the manner and means by which the product is accomplished; the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in the business; the provision of employee benefits; and the tax treatment of the hired party.

*Ibid.* (quoting *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751–52 (1989)) (alterations adopted).  Other relevant factors may be considered as well, "so long as they are drawn from the common law of agency." *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 227 (2d Cir. 2008) (citation omitted); *see, e.g.*, *Felder*, 27 F.4th at 838 (identifying "control over an employee's hiring, firing, training, promotion, discipline, supervision, and handling of records, insurance, and payroll" as relevant factors).  The crux of the employer-employee inquiry is "the element of control." *Felder*, 27 F.4th at 843 (citation omitted).

Under the "joint employer" doctrine, a plaintiff may also assert Title VII liability against a "constructive employer"—an entity that, though not the employee's formal employer, nevertheless shares control over aspects of the plaintiff's employment. *Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005).  A joint employer relationship is established "when two or more entities, according to common law principles, share significant control of the same employee." *Felder*, 27 F.4th at 843.  Again, "[b]ecause the exercise of control is the guiding indicator," courts look to the common law principles of agency to determine whether a constructive employer-employee relationship exists.  *See id.* at 844 & n.8.

4

Plaintiff has not advanced sufficient evidence to survive summary judgment that The Arker Companies or Chateau were her employers—either solely, or jointly with AC Rincon. The record instead indicates that The Arker Companies and Chateau were several layers removed from plaintiff's working conditions. Her work was controlled in nearly all respects by AC Rincon, just one subcontractor of a subcontractor among many operating at the 911 Erskine jobsite. *Cf. Felder*, 27 F.4th at 846 ("[T]he USTA's influence over AJ Security employees may have been diluted by the fact that AJ Security was a subcontractor of CSC and thus two steps removed from the USTA's immediate control."). The parties focus on three indicia of agency that are particularly relevant here. *See Salamon*, 514 F.3d at 227 (disavowing a "mechanistic" inquiry and directing focus to those factors "actually indicative of agency in the particular circumstances" (citations omitted)). I examine each in turn.

*Hiring and Firing*: Chateau subcontracted out painting and drywalling at 911 Erskine to Rockaway, which in turn subcontracted taping services to AC Rincon. By plaintiff's own account, she was hired by AC Rincon, not Chateau, to perform taping work at the 911 Erskine jobsite. Garcia Dep. Tr. 49:7–50:14 (Dkt. #59-5). On her first day, she spoke to AC Rincon's foreman, who told her she was hired and directed her to work with defendant Casas. *Ibid.* After some time on the job, she then spoke directly with Rincon to negotiate her rate of pay. Garcia Dep. Tr. 54:17–55:24. And after a few months, when the construction project's needs changed, Rincon made the decision to lay her off rather than move her to another jobsite, as he did with other, more experienced workers. Rincon Dep. Tr. (Sept. 7, 2022) 79:2–21, 90:18–91:8 (Dkt. #59-7); Rincon Dep. Tr. (Sept. 12, 2022) 191:12–19 (Dkt. #59-13); *see Felder*, 27 F.4th at 846 (finding that a company had no control over a subcontractor's employee's firing where its request to the

subcontractor "does not terminate the employee's continued employment with the subcontractor, nor prohibit the employee from working for other clients of the subcontractor").

Plaintiff's employment thus began—and ended—solely with AC Rincon.  By contrast, plaintiff testified at her deposition that she did not know what either The Arker Companies or Chateau were.  Garcia Dep. Tr. 88:18–21.  Nobody from either entity interviewed plaintiff, reviewed her qualifications, provided her with a description of her job, or told her she was hired or fired.  In fact, Garcia testified that nobody from either company spoke or interacted with her at all during her entire time working at 911 Erskine.  *Id.* 88:22–89:23.

In response to defendants' arguments on this factor, plaintiff mainly argues semantics.  Attempting to walk back her deposition testimony that she was "hired" by AC Rincon, plaintiff now claims that she was merely "'brought onto the job site' to work at 911 Erskine" by AC Rincon.  Pl.'s Br. in Opp. 4 (Dkt. #60) (quoting Pl.'s 56.1 Statement ¶ 55).  Similarly, she argues that neither AC Rincon's foreman nor Rincon himself ever specifically told plaintiff that she was "hired." *Ibid.* But, even if those particular words were not uttered, no reasonable jury could conclude from the undisputed facts that Rincon and his company had done anything in substance but "hire" her.  More importantly, the undisputed facts show that The Arker Companies and Chateau did not.

Plaintiff alternatively suggests that she must actually have been employed by The Arker Companies by pointing to an employee handbook issued by a company named "Progressive Management of NY," allegedly the human resources agent for all companies in the Arker family.  Pl.'s Br. in Opp. 9–10, 13–14, 19–20.  But while The Arker Companies provided this handbook to plaintiff during the course of discovery, no party to this litigation to date has identified any connection between the Arker employment handbook and plaintiff's employment that would suggest that its terms applied to her.  Pointedly, plaintiff admits that she never received it while

6

working at 911 Erskine.  Pl.'s 56.1 Statement ¶ 90.  Without such a link to plaintiff, the handbook does not suggest that plaintiff was actually hired or employed by The Arker Companies (or by Chateau).

*On-the-Job Supervision*: Both parties agree that plaintiff reported to defendant Casas for work assignments, instructions, and schedule changes during her time at 911 Erskine.  Pl.'s 56.1 Statement ¶ 69; Defs.' 56.1 Statement ¶¶ 34–44.  And both parties agree that Casas supervised her taping work and provided her with feedback.  Garcia Decl. ¶¶ 54–55; Defs.' 56.1 Statement ¶¶ 44–45.  The parties disagree about who Casas's employer was: The Arker Companies and Chateau argue that Cases was employed by AC Rincon, while plaintiff claims Casas *might* have been a Rockaway employee.

At the outset, it is worth noting that plaintiff's speculation about Casas's employment is predicated on paper-thin evidence: the fact that records held by yet another non-party vendor charged with monitoring access to the 911 Erskine jobsite listed Casas as a Rockaway employee, not an AC Rincon employee.  *See* Pl.'s 56.1 Statement ¶ 72.  By contrast, Rincon unequivocally testified at his deposition that Casas was his employee, that he paid Casas, and that he had hired Casas to work at 911 Erskine—admissions that would not inure to his interest as a defendant in a sex-discrimination suit predicated largely on Casas's actions.  Rincon Dep. Tr. (Sept. 7, 2022) 63:11–65:13.

Setting that aside, however, even if Casas was employed by Rockaway, not AC Rincon—as difficult as that is to believe—that would have no bearing on whether The Arker Companies or Chateau supervised plaintiff's employment.  Rockaway is not a party to this suit; nor does plaintiff allege that Rockaway has any relationship to the Arker family of entities.  Plaintiff points to no evidence tying Casas's supervision of her day-to-day work to either defendant here.

7

While plaintiff suggests that Chateau or The Arker Companies could still qualify as joint employers because they engaged in some supervision at the jobsite, she describes quality control and safety oversight that is too modest to support a joint-employer relationship. To support a joint-employer finding, a defendant's supervision must be "extensive" and must "demonstrate[] effective control of the terms and conditions of the plaintiff's employment." *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 75 (2d Cir. 2003). Plaintiff has alleged nothing of this sort with respect to Chateau or The Arker Companies. Plaintiff contends that employees of one or both companies would meet with subcontractors' foremen to discuss their work. Pl.'s 56.1 Statement ¶¶ 17–19. But quality-control supervision of a subcontractor's work "has no bearing on the joint employment inquiry, as such supervision is perfectly consistent with a typical, legitimate subcontracting arrangement." *Zheng*, 355 F.3d at 75; *see, e.g.*, *Godlewska v. Hum. Dev. Ass'n, Inc.*, 916 F. Supp. 2d 246, 259 (E.D.N.Y. 2013), *aff'd*, 561 F. App'x 108 (2d Cir. 2014). Plaintiff also suggests that one or both companies set workplace safety rules and hired a site safety manager to monitor compliance. Pl.'s 56.1 Statement ¶ 20. But merely setting sitewide safety rules and monitoring workers' compliance does not involve "extensive" supervision of the work of subcontractors' employees that "demonstrate[s] effective control of the terms and conditions of the [their] employment." *Zheng*, 355 F.3d at 75; *see Godlewska*, 916 F. Supp. 2d at 259–61 (holding that the monitoring of compliance with safety-related rules did not establish joint employment relationship and compiling similar cases).

*Employment and Pay Records*: As previously discussed, Rincon set plaintiff's rate of pay and disbursed her weekly wages in cash. Pl.'s 56.1 Statement ¶¶ 55, 63. Although The Arker Companies and Chateau had established a minimum wage that applied to all subcontractors at 911 Erskine, defendant Rincon testified that he never saw this instruction and instead paid his

employees "according to what they knew how to do." Wage Order (Dkt. #60-13); Rincon Dep. Tr. (Sept. 7, 2022) 95:3–98:15 (Dkt. #61-6). And plaintiff admits that she recorded her hours worked in a logbook maintained by AC Rincon, as all AC Rincon employees were required to do, in a room at the 911 Erskine jobsite occupied by AC Rincon. Garcia Dep. Tr. 71:20–73:9 (Dkt. #61-5).

Plaintiff has not pointed to evidence creating a genuine dispute of fact as to which company recorded plaintiff's hours worked for purposes of payroll. Plaintiff invokes a declaration she submitted with her summary judgment motion, in which she implies that she did not in fact record her hours worked in AC Rincon's logbook or was not required to do so. Garcia Decl. ¶ 43 (stating that she "was never required to log [her] hours for AC Rincon or any other company"). But "[i]t is well settled that the party opposing summary judgment may not create a triable issue of fact merely by submitting an affidavit that disputes his own prior sworn testimony." *Moscatelli v. Owl's Nest, Inc.*, 554 F. Supp. 3d 437, 444 (E.D.N.Y. 2021) (citation and quotation marks omitted); *see Resiner v. Gen. Motors Corp.*, 671 F.2d 91, 93 (2d Cir. 1982) (disregarding "factual claims" made after defendant "moved for summary judgment, where those claims contradict statements made previously by [plaintiff] at his deposition, in his affidavits, and in response to defendant's interrogatories"). Plaintiff also suggests that a jury could infer that the hours used to calculate her pay were those recorded in turnstile records kept by a third-party security vendor. Garcia Decl. ¶¶ 40, 43. But there is no evidence from which a jury could infer that these turnstile swipes were used in connection with payroll for AC Rincon employees. To the contrary, The Arker Companies' owner testified that while turnstile records are used for payroll purposes at other sites, the turnstile records were not used for that purpose at 911 Erskine. Arker Dep. Tr. 138:2–141:15 (Dkt. #59-3).

9

In sum, it is undisputed that AC Rincon set plaintiff's rate of pay and maintained the records of her hours worked. The Arker Companies and Chateau, by contrast, were not involved in setting plaintiff's rate or method of pay. Quite the opposite—to the extent that Arker required a minimum wage at the 911 Erskine jobsite, Rincon apparently ignored it.

\* \* \*

Having failed to advance evidence weighing in her favor on any of these factors, plaintiff cannot succeed in showing that either The Arker Companies or Chateau exercised the degree of control over the terms and conditions of her employment sufficient to deem them her "employer," whether solely or jointly. *See, e.g.*, *Felder*, 27 F.4th at 845–46; *Toledo v. Brend Restoration, LLC*, No. 21-cv-882, 2023 WL 3381249, at \*3 (S.D.N.Y. May 11, 2023); *Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404, 423–29, 434–38 (S.D.N.Y. 2017). Considering the totality of the circumstances, The Arker Companies and Chateau's relationship to plaintiff's employment by AC Rincon is nothing more than a "run-of-the-mill subcontracting relationship[]" (actually, a sub-subcontracting relationship), which the Second Circuit has been careful to caution should not automatically yield Title VII liability. *Zheng*, 355 F.3d at 74; *see Felder*, 27 F.4th at 847. The Arker Companies and Chateau are entitled to summary judgment on plaintiff's claims.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted.  Because defendants The Arker Companies, LLC and Chateau GC, LLC prevail on all claims asserted against them, they are dismissed from this action.

SO ORDERED.

                                                                      */s/ Rachel Kovner*
                                                                      RACHEL P. KOVNER
                                                                      United States District Judge

Dated: August 21, 2024
        Brooklyn, New York